## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANNABELLE GONZALES,

      Plaintiff,

v.                                        Civ. No. 20-914 KK

KILOLO KIJAKAZI,[1]
Acting Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER[2]

      THIS MATTER is before the Court on Plaintiff Annabelle Gonzales' Motion to Reverse or Remand the Administrative Decision (Doc. 22), filed June 17, 2021.[3] The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition to the Motion on September 20, 2021, and Ms. Gonzales filed a reply in support of it on September 30, 2021. (Docs. 26, 27.) Having meticulously reviewed the entire record and the relevant law and being otherwise fully advised, the Court finds that Ms. Gonzales' Motion is well taken and should be GRANTED, the portion of the Commissioner's decision denying Ms. Gonzales' claims should be REVERSED, and this matter should be REMANDED to the Commissioner for further proceedings.

## I.  Factual Background and Procedural History

      Ms. Gonzales brings this suit pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking

---

[1] Kilolo Kijakazi has been automatically substituted for her predecessor, Andrew Saul, as the defendant in this suit. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 15.)

[3] Ms. Gonzales filed a memorandum in support concurrently with the Motion. (Doc. 23.)

reversal of the portion of the Commissioner's decision denying her claims for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI") from May 10, 2016 to September 26, 2019. (Doc. 1 at 2.)

### A. Factual Background

Ms. Gonzales worked as a surveyor's helper, kitchen helper, and light truck driver until May 2016, when she stopped working due to medical problems. (AR 60–67, 69.[4]) At her November 2019 hearing, Ms. Gonzales testified that she lived with her son and his two children and took care of the children after school from approximately 4:20 to 5:00, as well as "[s]ometimes" during summer vacation.[5] (AR 67–68.) She stated that she did her own laundry and "some light dusting," prepared microwavable food and sandwiches, and went to the grocery store "once in a while." (AR 69.) Ms. Gonzales testified that she could not read and understand a newspaper or write somebody a note "and explain things[,]" but could write a full sentence "[i]f it's a small [one]." (AR 78.) According to Ms. Gonzales, she was unable to perform her duties as a cashier at Albertson's because she was "[n]ot good" at making change. (AR 78.) Ms. Gonzales indicated that she could sit for "maybe" 30 minutes at a time, stand in one place for five to ten minutes, walk for five to ten minutes, and lift five to ten pounds, and that she wore a brace on her left knee prescribed by a doctor.[6] (AR 79, 82–84.) She reported she could only drive for 30 minutes at a time due to back pain. (AR 86.)

---

[4] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on April 22, 2021. (Doc. 19.)

[5] In March 2018 and December 2018 adult function reports, Ms. Gonzales indicated that she lived alone and did not take care of anyone else. (AR 378-79, 397-98.) Psychotherapy notes indicate that Ms. Gonzales moved in with her son in or around the beginning of April 2019 while recovering from right shoulder surgery. (AR 1253.)

[6] The hearing transcript indicates Ms. Gonzales testified that a "Dr. Oakland" prescribed the knee brace, (AR 82-83); however, this appears to be a phonetic transcription error and that the doctor who prescribed the knee brace was Justin O'Guinn, M.D. (*See* AR 1230, 1400.)

As further discussed below, Ms. Gonzales received treatment for numerous ailments in and around the relevant time frame.

*1. Knee and foot disorders*

Ms. Gonzales saw Paul Legant, M.D., for knee pain on three occasions between March 2013 and October 2014. (AR 477-82.) On March 21, 2013, Dr. Legant noted a remote medical history of accidental injury to Ms. Gonzales' left knee. (AR 481.) He also noted that Ms. Gonzales' left knee had a small effusion and mild generalized swelling, her gait was slightly antalgic, and x-rays of her left knee showed "increased narrowing and moderate signs of arthritic changes, somewhat tricompartmental," as well as "evidence of previous surgery." (AR 481-82.) He made a probable diagnosis of progressive arthritic change to Ms. Gonzales' left knee, administered a corticosteroid injection, and expressed hope that a knee replacement was "years away." (AR 482.)

When Ms. Gonzales returned to Dr. Legant on February 27, 2014, she complained of bilateral knee pain. (AR 479.) Dr. Legant noted a positive McMurray's test on Ms. Gonzales' right knee and that x-rays revealed "osteoarthritic changes of both knees along the medial and lateral femorotibial joint lines as well as along both infrapatellar regions." (AR 479.) He diagnosed "bilateral degenerative joint disease" and administered bilateral corticosteroid injections. (AR 479.)

At her last visit with Dr. Legant on October 30, 2014, Ms. Gonzales reported that the previous injections had helped but her symptoms were "progressing." (AR 477.) Dr. Legant noted "more tenderness in the anteromedial aspect of the right knee," "mild positive McMurray's and Apley's grind test," and antalgic gait "secondary to knee symptoms." (AR 477.) He assessed

"[r]ight greater than left knee painful symptoms with findings also consistent with internal derangement" and recommended a right knee MRI. (AR 477-78.)

On March 19, 2015, Ms. Gonzales consulted podiatrist Jason Dodder, D.P.M., for bilateral foot pain. (AR 586.) Dr. Dodder diagnosed bilateral hammertoes, right foot bunion, and left foot capsulitis and neuroma, and administered a corticosteroid injection. (AR 587.) Ms. Gonzales returned to Dr. Dodder on December 21, 2015, when he diagnosed left foot plantar fasciitis, and right foot capsulitis, partial plantar plate rupture, and partial subluxation. (AR 584.) He administered bilateral corticosteroid injections and put Ms. Gonzales' right foot in a CAM walker. (AR 584-85.) When Ms. Gonzales returned to Dr. Dodder again on June 23, 2016 for right foot pain, he diagnosed right foot bunion and hammertoe with dislocated joint, and recommended surgery. (AR 581-82.) On September 30, 2016, Dr. Dodder performed a right foot bunionectomy, hammertoe correction, joint fusion, joint release, and osteotomy. (AR 675-77.)

Ms. Gonzales attended several follow-up appointments with Dr. Dodder tracking her recovery from surgery. (AR 566-77.) By January 9, 2017, she reported that "she still feels like the ball of the [f]oot is [a] little puffy and there is some discomfort when she is on [it] a lot, but overall she does really [well]." (AR 564.) At a follow up visit on April 10, 2017, Dr. Dodder noted "mild right ball of foot pain and left early bunion and hammertoes." (AR 563.) He also noted the possibility that Ms. Gonzales' left foot would need surgery. (AR 563.)

Ms. Gonzales saw rheumatologist Barbara Segal, M.D., on December 1, 2016 and January 20, 2017.[7] (AR 520, 526.) Dr. Segal assessed polyarthralgia, including of the knees and feet, and noted "sausage swelling" of Ms. Gonzales' right fourth toe consistent with psoriatic arthritis. (AR 520, 526.) She prescribed meloxicam and clobetasol. (AR 522.)

---

[7] The ALJ erroneously referred to Dr. Segal as Dr. DaVita. (AR 34-35.)

On March 28, 2017, Ms. Gonzales visited Eva Hardy, N.P., complaining of bilateral knee pain. (AR 656.) NP Hardy noted crepitus, tenderness to palpation and swelling over the medial joint lines, pain on flexion, positive Valgus/Varus and McMurray's, and pain with extension against resistance. (AR 657.) NP Hardy ordered x-rays, which showed moderate degenerative osteoarthritis with asymmetric joint space narrowing and osteophytes in the left knee, and moderate to advanced osteoarthritis with joint space narrowing, moderately sized osteophytes, juxta articular sclerosis, and patellofemoral arthritic changes in the right knee. (AR 658, 747-48.) NP Hardy increased Ms. Gonzales' meloxicam and administered bilateral corticosteroid injections. (AR 658.)

When Ms. Gonzales visited rheumatologist Salvador Garcia, M.D., for psoriatic arthritis on July 13, 2017, he noted that her left knee was painful on flexion and extension. (AR 654.) At another visit on December 14, 2017, he noted that her left knee was tender to palpation. (AR 621.)

On January 22, 2018, Ms. Gonzales returned to NP Hardy for knee pain. (AR 610.) NP Hardy ordered new x-rays, which she reported continued to show multiple abnormal findings bilaterally, including "tricompartmental osteoarthritis as well as advanced degeneration of the patellofemoral joint space" of the left knee. (AR 612.) NP Hardy noted that Ms. Gonzales had failed conservative treatment and recommended that she be evaluated by Justin O'Guinn, M.D., or another surgeon, for left total knee replacement surgery. (AR 612.) However, at physical therapy for her back on March 27, 2018, Ms. Gonzales reported that "she doesn't think she can get a knee replacement until after her brother-in-law recovers from surgery." (AR 1047.)

Ms. Gonzales had appointments scheduled with Dr. O'Guinn on February 15, 2018 and April 16, 2018. (AR 807, 821, 1031.) The record includes no contemporaneous notes describing these appointments. However, when Ms. Gonzales saw Dr. O'Guinn on February 20, 2019 for

right shoulder pain, he noted that he had previously seen her for knee pain and recorded her report that "her left knee is still painful and bracing provides mild relief." (AR 1220.)

At a psychotherapy appointment on August 26, 2019, Lora Smalley, L.M.F.T., noted Ms. Gonzales' report that "[s]he has healed from her shoulder surgery and is working on gaining her strength back but is now going to have to follow up about a knee she is having pain with." (AR 1352.)

On October 3, 2019, Ms. Gonzales returned to Dr. O'Guinn for bilateral knee pain. (AR 1400.) At this appointment, Dr. O'Guinn indicated that when she had seen him one and a half years earlier, "[s]he wanted to hold off on surgical intervention and elected to try an unloader brace." (AR 1400.) Dr. O'Guinn noted several abnormal findings on exam, including bilateral valgus deformity, bilateral patellar compression, and bilateral tenderness to palpation, as well as reduced range of motion on the left. (AR 1403-04.) According to Dr. O'Guinn, knee x-rays "show[ed] severe osteoarthritis, rimming osteophytes and tricompartmental arthritis." (AR 1404, 1417.) "Due to the severity of her pathology and previous [corticosteroid] injections that she no longer finds effective," he recommended a left total knee arthroplasty. (AR 1404.) At a visit on October 28, 2019, Dr. Garcia noted Ms. Gonzales' report that "[k]nee pain is 10 out of 10 using a brace." (AR 1406.)

   2.  *Back and shoulder disorders*

On January 8, 2015, Ms. Gonzales saw Carlos Esparza, M.D., for follow-up after a cervical spine nerve root block in December 2014. (AR 487.) Physical exam revealed a positive Jobe's test on the right shoulder. (AR 487.) Dr. Esparza diagnosed cervicalgia with a history of brachial neuritis, noted his suspicion of underlying shoulder involvement, and ordered x-rays. (AR 488.) When she saw Dr. Esparza again on January 19, 2015, he reported that x-rays showed "moderate

arthrosis of the AC joint as well as multiple cystic-appearing degenerative changes in the right humeral head." (AR 489.) He noted tenderness on palpation, "some pain with rise over 90 degrees," and crepitus, and recommended an injection, to which Ms. Gonzales agreed. (AR 489.)

On November 28, 2016, Ms. Gonzales visited NP Hardy complaining of right shoulder pain. (AR 670-71.) NP Hardy noted joint tenderness, positive O'Brien's, Neer, and Hawkins tests, and pain at the extremes of mobility, with x-rays showing mild to moderate degenerative changes. (AR 673, 754.) NP Hardy administered a corticosteroid injection at this visit. (AR 673.)

When Ms. Gonzales saw Dr. Garcia for psoriatic arthritis on July 13, 2017, she reported low back pain. (AR 654.) Dr. Garcia referred her to Christina Armijo, C.N.P., who saw Ms. Gonzales on September 15, 2017. (AR 638.) CNP Armijo noted that x-rays showed mild to moderate sacroiliac joint degeneration with mild osteophyte and sclerosis, moderate degenerative change of L5-S1 with moderate loss of intervertebral disc space, and mild degenerative change of the remainder of the lumbar spine. (AR 638-39.) She further noted positive bilateral axial loading and tenderness upon palpation of the lumbosacral region, sacroiliac joint, and trochanteric bursa. (AR 640.) CNP Armijo recommended facet injections and referred Ms. Gonzales to physical therapy. (AR 641.) Robert Zuniga, M.D., administered the recommended injections with sedation on October 13, 2017. (AR 633-35.) When Ms. Gonzales returned to CNP Armijo on November 13, 2017, she reported "minimal relief" from these injections. (AR 628.)

Ms. Gonzales attended physical therapy for low back pain on October 16, 2017 and October 23, 2017. (AR 628, 630.) She was discharged on December 8, 2017 for non-attendance.

(AR 623.) CNP Armijo later noted Ms. Gonzales' report that she was unable to complete physical therapy due to a death in the family. (AR 599.)

On December 29, 2017, Charles Pace, M.D., performed bilateral lumbar facet medial branch nerve blocks with sedation. (AR 615-16.) Ms. Gonzales failed these injections. (AR 613.) Dr. Pace administered bilateral sacroiliac joint corticosteroid injections with sedation on January 5, 2018. (AR 613-14.) X-rays on January 23, 2018 showed "[d]egenerative changes in the lower lumbar spine particularly level L5-S1." (AR 691.)

When Ms. Gonzales saw primary care physician Santiago Ayala, M.D.,[8] on January 24, 2018, he noted paravertebral lumbosacral muscle spasm and antalgic gait on physical exam. (AR 1153-54.) On January 30, 2018, Ms. Gonzales returned to CNP Armijo, who again referred Ms. Gonzales to physical therapy and indicated she would order an MRI for symptoms that did not improve. (AR 602.) Ms. Gonzales returned to physical therapy for her lower back pain from February 27, 2018 to March 27, 2018. (AR 819, 1046-48, 1051, 1056-58.)

Ms. Gonzales saw NP Hardy on October 31, 2018 for right shoulder pain; NP Hardy administered a corticosteroid injection. (AR 1082.) Ms. Gonzales returned to NP Hardy on January 30, 2019 with the same complaint. (AR 1199, 1202.) NP Hardy noted painful range of motion, palpable tenderness, reduced strength on abduction, and painful O'Brien's, Hawkins', and Neer's tests. (AR 1202.) She took updated x-rays which showed cystic changes at the proximal humerus and mild degeneration at the glenohumeral and AC joint spaces. (AR 1202.) She administered a corticosteroid injection and referred Ms. Gonzales for an MRI. (AR 1202.) On exam the following day, Dr. Garcia noted decreased abduction of her right shoulder due to pain. (AR 1209.)

Ms. Gonzales returned to CNP Armijo on February 5, 2019 for chronic back pain. (AR

---

[8] The ALJ erroneously referred to Dr. Ayala as Dr. Aguilar. (AR 38.)

1212.) CNP Armijo noted tenderness on palpation of the bilateral lumbosacral region, referred her to physical therapy, and prescribed tizanidine. (AR 1216-17.)

On February 20, 2019, Ms. Gonzales saw Dr. O'Guinn for her right shoulder pain. (AR 1219-20.) He noted reduced range of motion, tenderness to palpation, positive Neer Impingement and Speeds tests, and slightly reduced strength on exam, and indicated that a February 6, 2019 MRI showed "degenerative changes of post labrum, biceps tendon is flattened by traveling in the groove, large full-thickness tear of the supraspinatus, severe AC arthritis. Goutallier g[ra]de 2." (AR 1223, 1243.) Noting that Ms. Gonzales had "a full-thickness rotator cuff tear" that would "likely continue to progress in size," Dr. O'Guinn found it reasonable to forego physical therapy and proceed to surgery. (AR 1224.)

On March 8, 2019, Ms. Gonzales underwent a right shoulder arthroscopy with rotator cuff repair, subacromial space decompression and biceps tenotomy. (AR 1235-38.) Afterward, she attended 22 physical therapy sessions to rehabilitate her shoulder. (AR 1338; *see also* AR 1274, 1278, 1284, 1291, 1294, 1306, 1309, 1313.) At the conclusion of physical therapy, David Scussel, P.T., noted that Ms. Gonzales still had pain when she lifted her arm above shoulder height and had only partially met her range of motion and strength goals. (AR 1338-41.) Likewise, at a follow up appointment on August 12, 2019, Dr. O'Guinn noted reduced active range of motion and tenderness to palpation and observed that Ms. Gonzales "continue[d] to have some weakness in her arm." (AR 1347-48.) He recommended she continue her home exercise program and follow up in three months. (AR 1348.)

*3.  Other physical disorders*

On February 1, 2017, Ms. Gonzales underwent surgery for urinary stress incontinence. (AR 661-63.)

9

When Ms. Gonzales saw Dr. Garcia on July 13, 2017, June 26, 2018, October 17, 2018, January 31, 2019, July 8, 2019, and October 28, 2019, he noted that some of her bilateral finger joints were tender to palpation and/or had small Heberden's and Bouchard's nodes. (AR 654, 1085, 1092, 1209, 1332, 1410.) X-rays taken on July 13, 2017 showed "minimal to mild osteoarthritic change of the hands and wrists." (AR 736.) Dr. Garcia ordered laboratory tests, which showed a positive antinuclear antibody result on July 13, 2017, (AR 726), and elevated C-reactive protein ("CRP") on December 14, 2017, March 14, 2018, June 25, 2018, October 9, 2018, May 29, 2019, and October 21, 2019. (AR 700, 1066, 1098, 1104, 1333, 1417.) Dr. Garcia diagnosed Ms. Gonzales with psoriatic arthritis, for which he prescribed medications including Humira, methotrexate, etanercept, clobetasol, and cosentyx. (AR 804, 859, 1075, 1111, 1209.)

   *4. Psychological disorders*

When Ms. Gonzales saw Dr. Ayala on March 28, 2017, he diagnosed her with chronic major depression and prescribed fluoxetine. (AR 1142.) At another visit on December 21, 2018, Dr. Ayala noted "[a]nhedonia," "[i]nappropriate mood and affect—depressed," and "[s]uicidal ideation." (AR 1174.) He increased her dose of fluoxetine, prescribed trazadone, and referred her to counseling. (AR 1175.) Dr. Ayala noted "mild to no improvement" at a follow up visit on January 9, 2019, (AR 1181), and on January 23, 2019, he noted Ms. Gonzales' depressed and flat affect and suicidal ideation, for which he prescribed Wellbutrin. (AR 1188-89.)

Ms. Gonzales underwent a behavioral health assessment on February 26, 2019, at which she was diagnosed with major depressive disorder, recurrent severe, and post-traumatic stress disorder. (AR 1266-71.) She attended psychotherapy sessions with Lora Smalley, L.M.F.T., on March 7, 2019, April 30, 2019, August 26, 2019, and September 30, 2019. (AR 1257-58, 1350, 1352, 1374.)

At a visit on April 17, 2019, Dr. Ayala again noted Ms. Gonzales' flat affect and suicidal ideation and increased Ms. Gonzales' Wellbutrin dose. (AR 1247, 1250-51.) Debra Jaccard, P.M.H.N.P., performed a psychiatric evaluation on Ms. Gonzales on May 10, 2019, noting her depressed, anxious mood, depressive preoccupations, and impaired attention/concentration. (AR 1367, 1371.) PMHNP Jaccard assessed Ms. Gonzales as having PTSD and major depressive disorder. (AR 1371-72.) Ms. Gonzales also saw Estelle Elliott, F.N.P., on June 7, 2019 for psychiatric medication management. (AR 1360.) FNP Elliott noted Ms. Gonzales' anxious, depressed, and fearful affect and mood swings, and prescribed Wellbutrin, Prozac, and clomipramine. (AR 1363-64.)

5. *Medical source opinions*

a. <u>Santiago Ayala, M.D.</u>

Dr. Ayala was Ms. Gonzales' primary care physician from August 2016 to at least August 2019. (AR 1126, 1355.) On February 8, 2018, he completed a Residual Functional Capacity Questionnaire regarding Ms. Gonzales. (AR 811-16.) On this form, Dr. Ayala noted Ms. Gonzales' diagnoses of "degenerative changes in lumbar spine" and "psoriatic arthritis" and her symptoms of back, knee, and foot pain and depression. (AR 811.) He referred to her "x-ray results" as "the clinical findings and objective signs" supporting his opinions, and noted that she was taking methocarbamol, meloxicam, methotrexate, and Humira for her conditions. (AR 811.) Dr. Ayala also indicated that Ms. Gonzales was not "a malingerer" and that her impairments were reasonably consistent with her symptoms and functional limitations. (AR 812.)

Dr. Ayala opined that Ms. Gonzales was incapable of even low stress jobs. (AR 813.) He indicated she could walk less than a city block without rest or severe pain, sit for 15 minutes at a time, stand for five minutes at a time, and sit, stand, or walk for less than two hours total in an

eight-hour workday. (AR 813.) He opined that Ms. Gonzales would need to shift positions at will, and that she would need unscheduled breaks every 10 minutes for five minutes to rest. (AR 814.) He indicated she could occasionally carry less than 10 pounds, rarely twist, and never stoop, bend, crouch, squat, or climb ladders or stairs. (AR 815.) He also opined that she would likely need to be absent from work more than four days per month due to her impairments or treatment. (AR 816.) Finally, Dr. Ayala opined that Ms. Gonzales was not capable of working a full-time work schedule at any level of exertion. (AR 816.)

       b.  <u>Louis Wynne, Ph.D.</u>

Dr. Wynne, a state agency consultative examiner, evaluated Ms. Gonzales on April 18, 2018. (AR 1034-37.) *Inter alia*, Dr. Wynne noted that Ms. Gonzales wore "a large hinged knee brace on the left leg" and "was cooperative within the limits of her level of intellectual functioning." (AR 1034.) Based on his evaluation, Dr. Wynne diagnosed Ms. Gonzales with mild intellectual disability and mild neurocognitive disorder and opined that Ms. Gonzales' "concentration and ability to persist at simple work tasks are at least mildly impaired," and that she "would have difficulty interacting with her supervisors," "might have difficulty adapting to changes in the workplace," and "could not manage her own benefit payments." (AR 1036-37.)

       c.  <u>Raul Young-Rodriguez, M.D.</u>

Dr. Young-Rodriguez, a state agency consultative examiner, evaluated Ms. Gonzales on April 21, 2018. (AR 1039-41.) Dr. Young-Rodriguez noted that Ms. Gonzales was "able to ambulate favoring her left leg," had "mild swelling of her left knee," and wore a left knee brace. (AR 1040.) He also documented reduced range of motion in Ms. Gonzales' bilateral knees. (AR 1041.) He indicated she was "able to perform one half of a squat" and "was not able to walk on [her] toes." (AR 1041.) Dr. Young-Rodriguez opined that Ms. Gonzales had a "mild to moderate

limitation of activity involving the right foot[,] prolonged standing[,] and prolonged walking," a "moderate limitation of activity involving the lumbar spine, repeated bending, [and] heavy lifting," and a "mild-to-moderate limitation of activity involving the right shoulder and lifting overhead." (AR 1041.)

### d. Salvador Garcia, M.D.

Treating rheumatologist Dr. Garcia completed a questionnaire regarding Ms. Gonzales on October 28, 2019. (AR 1394-98.) He listed her diagnoses as psoriatic arthritis and degenerative disc disease, and noted that he based these diagnoses on "psoriasis," "joint pain," and "inflammation markers – CRP elevated." (AR 1394.) He indicated he prescribed methotrexate, Humira, Enbrel, and cosentyx to treat her psoriatic arthritis and referred her to "Pain and Spine" for her degenerative disc disease. (AR 1394.) He opined that Ms. Gonzales would require 15-minute rest breaks every two hours during an eight-hour workday, and that her conditions would cause two to four absences per month. (AR 1395.) He indicated she could sit, stand, or walk for one hour at a time and two hours total in an eight-hour workday, could occasionally lift up to 10 pounds, less than occasionally engage in repetitive simple grasping and fine manipulation, use her right but not her left foot for repetitive motion, and occasionally bend and reach but never squat, crawl, or climb. (AR 1396-97.)

### B.  Procedural History

Ms. Gonzales applied for DIB and SSI on January 3, 2018 and January 17, 2018, respectively. (AR 106, 124.) In both applications, she alleged disability beginning on May 10, 2016 due to arthritis, knee pain, anxiety, depression, and a back condition. (AR 106, 124.) Her claims were denied initially and on reconsideration. (AR 206, 217.) Administrative Law Judge ("ALJ") Lillian Richter held a hearing on November 26, 2019, at which Ms. Gonzales and an

impartial vocational expert ("VE") testified. (AR 52–101.)

The ALJ issued a partially unfavorable ruling on February 3, 2020, using the Commissioner's five-step sequential evaluation process.[9] (AR 28–43.) At step one, the ALJ found that Ms. Gonzales had not engaged in substantial gainful activity since her alleged disability onset date. (AR 30.) At step two, the ALJ found that Ms. Gonzales suffered from the severe impairments of bilateral metatarsophalangeal joint dislocation, left plantar fasciitis, hallux abductovalgus, psoriatic arthritis, lumbar spondylosis, lumbar facet arthropathy, sacroiliac disorder, osteoarthritis in the bilateral knees, depressive disorder, muscle spasm of back, mild neurocognitive disorder, mild intellectual disability, PTSD, obesity, and osteoarthritis of the right shoulder with full thickness rotator cuff tear and biceps tendinitis. (AR 31.) However, the ALJ determined at step three that these impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 31–32.)

The ALJ determined that Ms. Gonzales had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following additional limitations:

> The claimant can stand for four hours and sit for six hours in an eight-hour day. The claimant can occasionally stoop, kneel, crouch, crawl and balance, can frequently climb ramps and stairs, can never climb ladders, ropes or scaffolds, should avoid exposure to unprotected heights, hazardous machinery, vibration and extreme cold. The claimant can frequently handle, finger and feel bilaterally, and can occasionally reach overhead and frequently reach in all other directions with the right upper extremity. The claimant can perform simple, routine and repetitive work, can make simple-work related decisions in a workplace with few changes in the routine work setting, and can have occasional interaction with supervisors, coworkers and members of the public. The claimant may need to alternate from standing to sitting every forty-five minutes for ten minutes while remaining at the workstation.

---

[9] *See Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. §§ 404.1520, 416.920.

(AR 32–33.) In assessing Ms. Gonzales' RFC, the ALJ considered opinion evidence from Dr. Ayala, Dr. Wynne, Dr. Young-Rodriguez, and Dr. Garcia, and prior administrative findings from non-examining state agency consultants Richard Sorensen, Ph.D., Randal Reid, M.D., Mark Werner, M.D., Eileen M. Brady, M.D., Scott R. Walker, M.D., and Mark McGaughey, Ph.D. (AR 38–41.) At step four, the ALJ found that Ms. Gonzales could not perform her past relevant work as a surveyor helper, cook helper, or light truck driver. (AR 41.)

At step five, the ALJ made a partial finding of disability. (AR 41-43.) The ALJ found that, before September 27, 2019, an individual of Ms. Gonzales' age and with her education, work experience, and assessed RFC could have performed jobs existing in significant numbers in the national economy. (AR 41–42.) Specifically, based on VE testimony, the ALJ determined that Ms. Gonzales could have worked as a marker, router, or routing clerk. (AR 42.) The ALJ therefore concluded that Ms. Gonzales was not disabled from her alleged onset date of May 10, 2016 to September 26, 2019. (AR 42.) However, Ms. Gonzales entered a new age category ("advanced age") on September 27, 2019, the day before she turned 55.[10] (AR 41, 43.) Applying Medical-Vocational Rule 202.02, the ALJ found that Ms. Gonzales became disabled on that date. (AR 43.)

The Appeals Council denied review on August 20, 2020, and the ALJ's decision became administratively final. (AR 1–3.) Ms. Gonzales now seeks reversal of the portion of the ALJ's decision finding that she was not disabled from her alleged onset date to September 26, 2019. (Doc. 23 at 7.)

## II. <u>Standard of Review</u>

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct

---

[10] "A claimant reaches a particular age the day before his or her birthday." Social Security Administration, *Program Operations Manual System (POMS)* DI 25001.001(A)(2) (Nov. 16, 2021).

legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Thus, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be

remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III.  Analysis

Ms. Gonzales contends that the ALJ erred legally and that the challenged portion of her decision was not supported by substantial evidence. (Doc. 23.) Specifically, she argues that:  (1) the ALJ erred in rejecting the opinions of Dr. Ayala and Dr. Garcia; (2) the ALJ's RFC determination was not supported by substantial evidence; (3) the ALJ failed to incorporate the moderate concentration impairment she found at step three in her RFC assessment; and, (4) the ALJ erred in determining that, before September 27, 2019, Ms. Gonzales could perform jobs existing in significant numbers in the national economy. (*Id.* at 8-22.) As further explained below, the Court finds that the ALJ did not adequately explain her rejection of Dr. Ayala's opinions, and this error was not harmless and requires remand.

#### A.  The ALJ did not adequately explain her rejection of Dr. Ayala's opinions.

Ms. Gonzales first asserts that the ALJ failed to properly consider the medical opinions of her primary care physician, Santiago Ayala, M.D. (*Id.* at 9-11.) An ALJ may account for functional limitations a medical source assesses "by limiting the claimant to particular kinds of work activity" in the ALJ's RFC determination at step four. *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). When the ALJ does not do so, but instead assigns an RFC that contradicts a medical source opinion, the ALJ must explain why she did not account for the medical opinion in her RFC determination. *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (unpublished) ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence."). Where the ALJ does not adequately explain her rejection of a medical source opinion concerning the claimant's RFC, the

case must be remanded for the ALJ to do so. *Haga v. Astrue*, 482 F.3d 1205, 1208-09 (10th Cir. 2007); *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Givens*, 251 F. App'x at 568.

In *Haga*, 482 F.3d at 1207, a consulting mental health professional completed a mental RFC form "on which he marked [the claimant] moderately impaired in seven out of ten functional categories." The ALJ "rejected four of the moderate restrictions . . . while appearing to adopt the others." *Id.* at 1208. Because the ALJ did not explain why he did so, the court remanded "so that the ALJ can explain the evidentiary support for his RFC determination." *Id.* The Court noted that the consultant's opinion was uncontradicted and that "the evidence on which the ALJ explicitly relied in his decision does not imply an explanation for rejecting any of [the consultant's] restrictions on the mental RFC form, and, in fact, the ALJ never stated that he rejected [the consultant's] opinion." *Id.* Thus, because it was "simply unexplained why the ALJ adopted some of [the consultant's] restrictions but not others[,]" remand was appropriate. *Id.*; *see also Frantz*, 509 F.3d at 1302-03 ("[T]he ALJ erred in accepting some of the moderate limitations in the Mental RFC form . . . but rejecting others without discussion.").

As both parties acknowledge, (Doc. 23 at 9; Doc. 26 at 6), the Commissioner has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. §§ 404.1527 and 416.927 ("Evaluating opinion evidence for claims filed before March 27, 2017") *with* 20 C.F.R. §§ 404.1520c and 416.920c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). Because Ms. Gonzales filed her claims in 2018, the new regulations apply to this matter. (AR 106, 124.)

The new regulations provide that the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b). Addressing the agency's new "articulation requirements," the regulations state that,

> when a medical source provides multiple medical opinion(s) [sic] . . . we will articulate how we considered the medical opinions . . . from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion . . . from one medical source individually.

20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). The regulations further provide that

> [t]he factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions . . . in your case record.

20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[T]he factors in paragraphs (c)(3) through (c)(5)" are the source's "[r]elationship with the claimant," the source's "[s]pecialization," and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 404.1520c(c)(3)-(c)(5), 416.920c(c)(3)-(c)(5). If the ALJ finds that two or more differing opinions are equally well-supported and consistent, she must "articulate how [she] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5)." 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

As the Tenth Circuit recently explained,

> "[s]upportability" examines how closely connected a medical opinion is to the evidence and the medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be." [20 C.F.R.] § 404.1520c(c)(1); *id.* § 416.920c(c)(1). "Consistency," on the other hand, compares a medical opinion to the evidence: "The more consistent a

medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be." *Id.* § 404.1520c(c)(2); *id.* § 416.920c(c)(2).

*Zhu v. Comm'r, SSA*, — F. App'x —, 2021 WL 2794533, at *6 (10th Cir. Jul. 6, 2021) (brackets and ellipses omitted).

The agency's new regulations do not, in the Court's view, alter the Tenth Circuit's requirement that an ALJ must explain her rejection of any medical source opinions in the record concerning the claimant's RFC. *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1208; *Givens*, 251 F. App'x at 568. This requirement flows from the premise that an ALJ's decision must "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [she] rejects," *Clifton*, 79 F.3d at 1009-10, in order to provide the Court "with a sufficient basis to determine that appropriate legal principles have been followed[.]" *Jensen*, 436 F.3d at 1165. The requirement enables the courts to engage in meaningful judicial review of agency decisions.

Moreover, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan*, 399 F.3d at 1262 (citations and quotation marks omitted). Thus, the ALJ's reasons for rejecting medical opinions regarding the claimant's work-related abilities must be supported by substantial evidence, and the ALJ must consider all relevant medical evidence in weighing those opinions. *Id.*; *see generally, e.g., Langley*, 373 F.3d at 1116 (reversing ALJ's decision where, *inter alia*, ALJ's reasons for rejecting medical opinions were not or did not appear to be supported by substantial evidence).

The ALJ's discussion of Dr. Ayala's opinions is as follows:

Primary care provider Santiago Aguilar, M.D. gave a statement dated February 8, 2018 saying that the claimant can stand less than two hours in a workday and stand

or walk for only a few minutes at a time. She can occasionally lift ten pounds. She would absent [sic] from work four times or more a month. Dr. Aguilar provided no explanation for his conclusions and rather cited generally to the diagnoses and the claimant's subjective reports of pain. This opinion is not consistent with the totality of evidence. Just a few days prior to this opinion, the claimant was noted on exam to have full strength and range of motion in all extremities, normal gait, the ability to walk on heels and toes, but tender to palpation with mild to moderate findings on imaging. Other physical examination reports tended to be normal. As described above, the claimant cares for her grandchildren three times a week including picking them up from school. This opinion is not persuasive.

(AR 38 (citations omitted).)

Upon careful review of the ALJ's decision and the record as a whole, the Court finds that the ALJ failed to provide adequate reasons for rejecting Dr. Ayala's opinions. Initially, the ALJ failed to even mention, much less explain her rejection of, several of the work-related limitations to which Dr. Ayala opined, including that Ms. Gonzales could sit for no more than 15 minutes at a time and for less than two hours total in an eight-hour workday, would need to shift positions at will and take frequent unscheduled breaks, could rarely twist and never stoop, bend, crouch, squat, or climb ladders or stairs, and could not work a full-time work schedule at any level of exertion. (AR 813-16.) With the exception of climbing ladders, the ALJ did not incorporate these opinions in her assessment of Ms. Gonzales' RFC.[11] However, because the ALJ did not discuss them, the Court does not know whether the ALJ considered them and if so, what her reasons were for rejecting them. Thus, the Court cannot determine whether the ALJ applied correct legal standards with respect to the opinions she failed to discuss. *Jensen*, 436 F.3d at 1165.

Furthermore, the reasons the ALJ gave for rejecting the opinions she did discuss are not

---

[11] The ALJ did in her RFC assessment indicate that Ms. Gonzales "may need to alternate from standing to sitting every forty-five minutes for ten minutes while remaining at the workstation." (AR 33.) However, Dr. Ayala opined that Ms. Gonzales would need to alternate between sitting, standing, and walking "at will." (AR 814.) Likewise, the ALJ limited Ms. Gonzales to "occasionally" stooping, kneeling, crouching, and crawling and "frequently" climbing stairs but unlike Dr. Ayala did not completely exclude these activities. (AR 33.) In this regard, the Court notes that in an RFC "occasionally" means an activity "occurs at least once up to one-third of an 8-hour workday" and "frequently" means an activity "occurs one-third to two-thirds of an 8-hour workday." Social Security Administration, *Program Operations Manual System (POMS)* DI 25001.001(A)(33), (53) (Nov. 16, 2021).

supported by substantial evidence. First, for her supportability analysis, 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), the ALJ asserted that Dr. Ayala "provided no explanation for his conclusions," which is simply incorrect. (AR 38.) Indeed, the ALJ's analysis on this point is not even internally consistent, because after stating that Dr. Ayala provided no explanation, she acknowledged that he "cited generally to the diagnoses and the claimant's subjective reports of pain." (AR 38.) In addition, the form Dr. Ayala completed indicates that he had treated Ms. Gonzales since August 2016, she had diagnoses of degenerative changes in lumbar spine and psoriatic arthritis, her symptoms included back, knee, and foot pain and depression, her x-ray results were objective signs, she was prescribed methocarbamol, meloxicam, methotrexate, and Humira, she was not "a malingerer," and her impairments were reasonably consistent with her symptoms and functional limitations. (AR 811-12.) Thus, Dr. Ayala did provide explanations for his conclusions, and the ALJ's supportability analysis is not supported by substantial evidence. *See Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir. 2012) (agency's reasoning that doctor's assessment "d[id] not contain any medical findings" was "incorrect and unsupported by substantial evidence" where doctor "did supply medical findings for the physical capacities he assigned to [the claimant]") (emphases omitted).

The ALJ's consistency analysis of Dr. Ayala's opinions, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2), is equally flawed. In her decision, the ALJ stated that Dr. Ayala's opinions were "not consistent with the totality of evidence," based on findings from a single medical appointment and the broad statement that "[o]ther physical examination reports tended to be normal." (AR 38.) There are two significant problems with this analysis. First, the ALJ's description of the findings from the one appointment she specifically discussed is incomplete. In her consistency analysis, the ALJ relied on CNP Armijo's January 30, 2018 notes for the proposition that Ms. Gonzales "was

noted on exam to have full strength and range of motion in all extremities, normal gait, the ability to walk on heels and toes, but tender to palpation with mild to moderate findings on imaging." (AR 38 (citing AR 599-602).) However, the ALJ failed to mention that Ms. Gonzales saw CNP Armijo only for back pain; CNP Armijo also noted bilateral axial loading at that exam; and, Ms. Gonzales had had bilateral sacroiliac joint injections less than a month earlier. (AR 599, 601, 614.) Also, the "mild to moderate findings on imaging" to which the ALJ referred were from x-rays taken in July 2017, concerned Ms. Gonzales' hands, wrists, and lumbosacral spine but not her knees, feet, shoulders, or cervical spine, and revealed, *inter alia*, "moderate degenerative change of L5-S1 with moderate loss of intervertebral disc space." (AR 599-600.) Thus, the ALJ's selective description of CNP Armijo's January 30, 2018 notes omitted several salient facts broadly consistent with Dr. Ayala's opinions.

Second, and more significantly, the ALJ's statement that "[o]ther physical examination reports tended to be normal" is manifestly wrong. (AR 38.) Contrary to the ALJ's assertion, the record includes abundant physical examination reports with abnormal findings, including reports to which the ALJ herself cited. (*See* AR 38 (citing AR 524, 640, 654, 1040-41, 1304-05, 1332).) These findings include: (1) with respect to Ms. Gonzales' knees, effusion and swelling (AR 481, 657), antalgic gait (AR 477, 481, 1154), positive McMurray's, Apley's grind, and valgus/varus tests (AR 477, 479, 657, 1403), tenderness on palpation (AR 477, 621, 657, 1403), crepitus (AR 657), pain on flexion and extension (AR 654, 657), patellar compression (AR 1403), and reduced range of motion (AR 524, 1403); (2) with respect to her feet, bunions with hallux abductus (AR 587, 593), hammertoes (AR 587), pain on palpation (AR 587), and swelling (AR 584), including fourth toe "sausage swelling . . . c[onsistent] w[ith] psoriatic arthritis" (AR 520, 524); (3) with respect to her right shoulder, positive Jobe's, O'Brien's, Neer, Hawkins, and Speeds tests (AR

487, 673, 1202, 1223), tenderness on palpation (AR 489, 673, 1202, 1347), painful and/or reduced range of motion (AR 489, 1202, 1209, 1223, 1305, 1332, 1347), and crepitus (AR 489); (4) with respect to her back, axial loading (AR 640), lumbosacral, sacroiliac, and trochanteric bursa tenderness on palpation (AR 640, 1216), and paravertebral lumbosacral muscle spasm (AR 1153); and, (5) with respect to her hands, finger joint tenderness on palpation (AR 654, 1085, 1092, 1209, 1332, 1410) and Herbeden's and Bouchard's nodes. (AR 654, 1085, 1209, 1332, 1410.) In short, a reasonable mind would not accept the record as adequate to support a finding that Ms. Gonzales' "physical examination reports tended to be normal." (AR 38); *see Langley*, 373 F.3d at 1118.

The ALJ's treatment of Dr. Young-Rodriguez's report further demonstrates her erroneous disregard of abnormal findings on physical examination of Ms. Gonzales. In rejecting Dr. Young-Rodriguez's opinions regarding Ms. Gonzales' functional limitations, the ALJ asserted that his "objective examination findings" included "full . . . range of motion, the ability to walk on heels and toes and squat." (AR 39; *see also, e.g.*, AR 36 ("Physical examination was normal except that Dr. Young-Rodriguez noted the claimant favored the left side during ambulation."); AR 40 ("Dr. Young-Rodriguez noted that the claimant had good range of motion . . . in all extremities.").) In fact, however, Dr. Young-Rodriguez noted that Ms. Gonzales had reduced range of motion in her bilateral knees, was only able to "perform one half of a squat," and "was not able to walk on [her] toes." (AR 1041.)

In discussing "the totality of evidence" on which she then relied to reject Dr. Ayala's opinions, the ALJ's errors and omissions regarding Ms. Gonzales' knee problems are particularly concerning.

- According to the ALJ, NP Hardy found "only mild positive signs on examination" of Ms. Gonzales' knees on March 28, 2017. (AR 35.) However, nowhere in her notes does NP

Hardy characterize her multiple abnormal exam findings as "mild." (AR 656-59.) And, x-rays NP Hardy obtained on that date showed *moderate* degenerative osteoarthritis with asymmetric joint space narrowing in the left knee, and *moderate to advanced* osteoarthritis with joint space narrowing, moderately sized osteophytes, juxta articular sclerosis, and patellofemoral arthritic changes in the right knee. (AR 658, 747-48.)

- The ALJ did not even mention Ms. Gonzales' return visit to NP Hardy on January 22, 2018, at which NP Hardy recommended that Ms. Gonzales be assessed for left total knee replacement "since her x-rays show tricompartmental osteoarthritis as well as advanced degeneration of the patellofemoral joint space." (AR 612.)

- The ALJ asserted that Ms. Gonzales "did not begin treatment for [back and knee pain] until November and December of [2016]," and "started treating for pain in her bilateral knees on March 28, 2017." (AR 37-38.) Not only do these statements appear internally inconsistent, but also the record flatly belies them. In fact, the record shows that Ms. Gonzales received a left knee steroid injection in March 2013 and bilateral knee steroid injections in February 2014.[12] (AR 479, 482.)

- And, though the ALJ did acknowledge that left knee x-rays Dr. O'Guinn reviewed on October 3, 2019[13] "showed severe osteoarthritis, rimming osteophytes and tricompartmental arthritis," she emphasized that "this occurred after the date the claimant became disabled," yet failed to add that (1) prior x-rays showed advanced knee arthritis much earlier, and (2) Ms. Gonzales "became disabled" on September 27, 2019, less than a

---

[12] The ALJ's statement regarding when Ms. Gonzales began treatment for back pain is similarly inaccurate:  Ms. Gonzales saw Dr. Esparza in January 2015 for follow up after a cervical spine nerve root block in December 2014. (AR 487.)

[13] The ALJ incorrectly indicated that this visit occurred on October 2, 2019. (AR 37.)

week before the October 3, 2019 appointment. (AR 37.)

Thus, unlike the ALJ's description of it, the actual record evidence regarding Ms. Gonzales' knee problems is consistent with Dr. Ayala's opinions about, for example, her limited ability to sit, stand, and walk, her need to shift positions at will, and her inability to stoop, bend, crouch, squat, and climb stairs. (AR 813-15.)

In light of the foregoing, the ALJ's assertion that Dr. Ayala's opinions were "not consistent with the totality of evidence," including because "physical examination reports tended to be normal," is not supported by substantial evidence. (AR 38.) The normal findings on which the ALJ relied are undercut by other evidence in the record, *Grogan*, 399 F.3d at 1262; and, several of her findings regarding the totality of the evidence, particularly with respect to Dr. Young-Rodriguez's examination and Ms. Gonzales' knee conditions, are simply wrong. *See Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence where it was belied by a letter in the record); *Stills*, 476 F. App'x at 161 (agency's reasoning was not supported by substantial evidence where it was "incorrect").

Finally, the ALJ's other purported example of evidence inconsistent with Dr. Ayala's opinions is also invalid. According to the ALJ, Dr. Ayala's opinions were inconsistent with two records noting that Ms. Gonzales "cares for her grandchildren three times a week including picking them up from school." (AR 38 (citing AR 1281, 1367).) Specifically, in notes regarding physical therapy after Ms. Gonzales' right shoulder surgery, PT Scussel wrote that Ms. Gonzales "takes care of 2 grandkids 3 days/week," (AR 1281); and, in her psychiatric evaluation, PMHNP Jaccard wrote that Ms. Gonzales "helps take care of her grandchildren by picking them up from school." (AR 1367.)

There are two problems with the ALJ's reasoning on this point. First, Ms. Gonzales caring

for grandchildren three times a week including picking them up from school is not necessarily inconsistent with the work-related limitations to which Dr. Ayala opined, depending on such factors as the number of children, the children's ages, how long she cared for them on each occasion, and the distance she drove to pick them up. Neither the ALJ nor the records to which she cited provide any details about these factors that would tend to contradict Dr. Ayala's opinions.

Second, and relatedly, the ALJ failed to acknowledge or discuss Ms. Gonzales' sworn testimony that her two grandchildren were about 8 and 9 years old, they took the bus to school, they live "right there," and she "g[o]t them" at about 4:20 and watched them until 5:00, "so not very long." (AR 67-68.) This testimony, if accepted, would significantly qualify the notations on which the ALJ relied and affirmatively demonstrate that Ms. Gonzales' limited care of her grandchildren was not inconsistent with the work-related restrictions to which Dr. Ayala opined.

Of course, "[c]redibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Hum. Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). However, having relied on two cursory notations regarding Ms. Gonzales' care of her grandchildren to discount Dr. Ayala's opinions, the ALJ was not free to simply ignore Ms. Gonzales' testimony qualifying these notations. Rather, she was required to evaluate this testimony to determine the extent to which Dr. Ayala's opinions are supported by the record and explain the consideration she gave them. *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1208; *Clifton*, 79 F.3d at 1009-10; *Givens*, 251 F. App'x at 568. Thus, this last proffered reason for rejecting Dr. Ayala's opinions is also inadequate.

**B.  The ALJ's error was not harmless.**

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless,

> harmless error analysis . . . may be appropriate to supply a missing dispositive
> finding where, based on material the ALJ did at least consider (just not properly),
> we could confidently say that no reasonable administrative factfinder, following the
> correct analysis, could have resolved the factual matter in any other way.

*Id.* at 733-34 (quotation marks and alteration omitted). The failure to provide adequate reasons for rejecting a medical opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014). In that situation, the claimant is not prejudiced because the outcome would have been the same even if the medical opinion had not been rejected. *See id.* at 579.

Here, however, Dr. Ayala's assessment of limitations on Ms. Gonzales' work-related abilities on the one hand, and the ALJ's RFC determination on the other, are inconsistent: the RFC determination largely fails to account for the limitations Dr. Ayala assessed. (*Compare* AR 32-33 *with* AR 811-16.) Had the ALJ accounted for Dr. Ayala's opinions, she would likely have assigned Ms. Gonzales a more restrictive RFC, for example, by imposing greater restrictions on standing, sitting, stooping, kneeling, crouching, crawling, and climbing stairs. This, in turn, would likely have resulted in different findings at steps four and five. Moreover, ample record evidence supports Dr. Ayala's opinions, such that the Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Fischer-Ross*, 431 F.3d at 733-34. Thus, the ALJ's failure to adequately explain her rejection of Dr. Ayala's opinions was not harmless. *Mays*, 739 F.3d at 578-79.

### C. Remaining Claims

The Court will not address Ms. Gonzales' remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.  <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion to Reverse or Remand the Administrative Decision (Doc. 22) is GRANTED. The portion of the Commissioner's decision denying Ms. Gonzales' claims for DIB and SSI from May 10, 2016 to September 26, 2019 is REVERSED and this matter is REMANDED to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order.

IT IS SO ORDERED.

KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent